**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **GRANGE MUTUAL CASUALTY** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:11-CV-487 (MTT)** |
| | ) | |
| **PINSON TRUCKING COMPANY, INC.,** | ) | |
| **MAURICE DION LAKE, TAMMY JONES** | ) | |
| **WILLIAMS, and MARCUS TERRELL** | ) | |
| **BOATWRIGHT** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ———————————————— | ) | |

## <u>ORDER</u>

Before the Court are the Parties' Cross Motions for Summary Judgment. (Docs. 26 and 27). Essentially, the Parties ask the Court to determine whether Plaintiff Grange Mutual Casualty Company's insurance policy should be rewritten by the Court to provide coverage for a tractor leased by its insured to a motor carrier. For the following reasons, Grange's Motion is **GRANTED**, and the Defendants' Motion is **DENIED**.

### I.   FACTUAL AND PROCEDURAL BACKGROUND

#### A.   Defendant Pinson Trucking Company's and Lumber Transport's Lease Arrangement

The Parties have stipulated to the relevant facts. (Doc. 25). Defendant Pinson Trucking Company (Pinson), which is insured by Grange, and Lumber Transport, Inc. (Lumber) are "for-hire motor carriers operating commercial motor vehicles for the purpose of transporting property." (Doc. 25 at 3). However, only Lumber is authorized by the United States Department of Transportation to transport property across state lines and by the State of Georgia to transport property within Georgia. (Doc. 25 at 3).

Pinson does not have any motor carrier authority, and thus cannot legally haul goods for hire.  (Doc. 25 at 4).  Presumably because of this, Pinson had for some time leased its truck, the tractor of a tractor-trailer rig, to Lumber, and Lumber operated the tractor pursuant to its motor carrier authority.[1] (Doc. 25 at 4).

Lumber agreed to provide liability insurance for the tractor.  (Doc. 25 at 8).  At the time of the accident giving rise to this action, Lumber had an insurance policy with Great West Casualty Company (Great West) providing liability coverage of $1,000,000 to Lumber, Pinson, and Pinson employees for any one accident or loss involving a motor carrier.  (Doc. 25 at 9-10).  The Great West policy included an endorsement for public liability pursuant to requirements under the Motor Carrier Act of 1980, 49 U.S.C. § 10101 *et seq.*, commonly called a Form MCS-90 endorsement.  (Doc. 25 at 9).  Lumber also had an excess liability insurance policy with Hallmark Insurance Company providing Lumber, Pinson, and Pinson employees with $2,000,000 in additional coverage.  (Doc. 25 at 10).  Although the lease agreement required Pinson to provide a driver for the tractor, the tractor would "at all times be operated to the exclusive direction and supervision of" Lumber.  (Doc. 25-7 at 2).  Further, the lease agreement gave Lumber "exclusive possession, control, and use" of the tractor, and Lumber "assume[d] complete responsibility for operation" of the tractor.  (Doc. 25-7 at 4).

## B.  The August 8, 2011 Accident

On August 8, 2011, Pinson employee Marcus Boatwright, while driving the Pinson-owned tractor leased to Lumber, was involved in an eight vehicle automobile

---

[1] The "Permanent Lease Agreement Contract" attached to the Parties' Stipulation of Facts identifies one tractor as the only equipment subject to the lease.   (Doc. 25-7 at 9).  The Parties' Stipulation of Facts states that "all of the tractors owned by Pinson" were leased to Lumber.  (Doc. 25 at 4).  Elsewhere in their Stipulation, the Parties state "[t]he tractor-trailer involved in the accident was owned by Pinson." (Doc. 25 at 10).  Whether Pinson leased other tractors and trailers to Lumber is not material.

accident.  (Doc. 25 at 10).  Three people died and several more were injured in this accident.  Defendants Maurice Dion Lake and Tammy Jones Williams[2] were among the injured.  The accident also caused significant property damage to vehicles and the roadway.  (Doc. 25 at 10).  The tractor was being operated by Lumber pursuant to the lease between Pinson and Lumber.  (Doc. 25 at 10).  Of course, Lumber was operating the tractor pursuant to its motor carrier operating authority.  (Doc. 25 at 11).

Following the accident and the filing of a civil lawsuit in the Superior Court of Greene County, Georgia against Great West, Pinson, Lumber and Boatwright, Great West undertook the legal defense of Pinson, Lumber and Boatwright.  (Doc. 25 at 12). All these parties are represented by the same counsel.  Boatwright admitted he was responsible for the August 8 accident; however, he reserved the issues of proximate cause and damages.  (Doc. 25 at 13).  Further, Pinson admitted that Boatwright was operating within the scope of his employment with Pinson at the time of the accident. (Doc. 25 at 13).[3]

### C.  The Grange Mutual Policy

Pinson had a "Commercial Package" policy with Plaintiff Grange Mutual Casualty Company (Grange).  (Doc. 25 at 5).   At the time Pinson's most recent policy with Grange was renewed,[4] Grange knew "that Pinson was a for-hire motor carrier operating motor vehicles for the purposes of transporting property in interstate and intrastate

---

[2] The Parties refer to Tammy Jones Williams as both "Jones" and "Williams" in the Stipulation of Facts. (Doc. 25).  For consistency purposes, the Court will refer to her as "Williams."

[3] Even though the lease agreement provided that the tractor was operating under the "exclusive direction and supervision" of Lumber and that Lumber had "exclusive possession, control, and use" of the tractor and "assume[d] complete responsibility" for its operation, Pinson was apparently satisfied that it was nonetheless responsible for the accident.  *See Hendley v. Evans*, 734 S.E.2d 548 (Ga. App. 2012).

[4] At oral argument, the Parties disclosed that the policy had been renewed nineteen times.

commerce."[5]  (Doc. 25 at 5).   However, neither Pinson nor Grange intended the

Grange policy to provide liability coverage for Pinson-owned vehicles that were leased

to Lumber and used in hauling freight and goods for hire.  (Doc. 25 at 8).

The Grange policy provided "general liability insurance for risks associated with

people coming on Pinson Trucking's premises" and "property damage coverage in case

any of Pinson Trucking's building were damaged or destroyed."  (Doc. 34 at 5) (citing

Doc. 25-5).  The policy included a commercial automobile coverage endorsement

insuring only two scheduled vehicles—a 1999 Chevrolet pick-up and a 2000 Fleetwood

motor home.  (Doc. 25 at 7).  Pinson owned both vehicles.  Of course, neither vehicle

was used by Pinson for hauling freight or goods for hire.  The Grange policy did not

contain a Form MCS-90 endorsement, nor did it contain a Georgia "Form 'F'"

endorsement.  A Form F endorsement is somewhat similar to a MCS-90 endorsement

and is required of certain intrastate motor carriers.[6]  (Doc. 25 at 7-8).

### D.  The Present Declaratory Judgment Action

On November 4, 2011, all known personal injury claims, and some property

damage claims, were settled at mediation, with the exception of Defendants Lake and

Williams.  (Doc. 25 at 14).  The settlement exhausted Great West's $1,000,000 policy

---

[5] To the extent this stipulation suggests that Pinson was itself acting as an authorized motor carrier, it is misleading.  Again, Lumber was operating Pinson's tractor pursuant to Lumber's authority as a motor carrier.

[6] Georgia's Public Service Commission Rules require that all certificates of insurance be made on Form E and all endorsements made on Form F. Rule 1-8-1-.07(d)-(e) of the Rules of the Georgia Public Service Commission.  Form E is styled "Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificate of Insurance."  Form F bears the title "Uniform Motor Carrier Bodily Injury and Property Damage Liability Insurance Endorsement."  Form E certifies that a designated insurer issued a specified motor carrier an insurance policy "which, by attachment of the Uniform Motor Carrier Bodily Injury and Property Damage Liability Insurance Endorsement, has... been amended to provide automobile bodily injury and property damage liability insurance covering the obligations imposed upon such motor carrier by the provisions of the motor carrier law...." Rule 1-8-1-.07(d) of the Rules of the Georgia Public Service Commission; see Kinard v. Nat. Indem. Co., 225 Ga. App. 176, 180(2), 483 S.E.2d 664 (1997).

limits, and Hallmark's $2,000,000 limits were reduced to $281,833.62.  (Doc. 25 at 15).

Lake and Williams have rejected Hallmark's remaining limits offered to settle their

claims.  (Doc. 25 at 15).

On November 21, counsel for Pinson, Boatwright, Lumber, Great West and

Hallmark[7] forwarded to Grange Williams' and Lake's settlement demand of

$1,036,380.50.  (Doc. 25 at 16).  Williams and Lake argue that Grange's policy "by

operation of law" should be rewritten to include coverage in the amount of $750,000, the

amount required for a MCS-90 endorsement.  (Doc. 25 at 16).  On December 7, counsel

for Pinson, Boatwright, Lumber, Great West and Hallmark also demanded (on behalf of

Pinson), that Grange pay $750,000.00 to Williams' and Lake's claims.  (Doc. 25 at 17).

On December 12, Grange sought a declaratory judgment determining whether the

Grange policy provides coverage to Pinson and Boatwright for the claims asserted by

Williams and Lake.  (Doc. 25 at 17; Doc. 1).

## II.  SUMMARY JUDGMENT STANDARD

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on

the evidence presented, "a reasonable jury could return a verdict for the nonmoving

party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir.

---

[7] The same counsel, retained by Great West, has represented the Defendants in this case throughout the litigation arising from the August 8 accident.  (Doc. 40).  Clearly, Great West sees no conflict among the parties.  The Court does not suggest there is, although it perhaps is significant that if Grange were forced to pay pursuant to an implied MCS-90 endorsement, Grange could seek reimbursement from Pinson. 49 C.F.R. § 387.15 ill. I. ("The insured agrees to reimburse the company for any payment made by the company ... for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in [the MCS-90 endorsement.").  The relevant point, however, is that the fact that one law firm could represent all the defendants bolsters the conclusion that Pinson and Lumber were, as a practical matter, operating as one motor carrier, and that carrier was Lumber.

2002); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing…relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The non-moving party does not satisfy his burden "if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact."  *Id.*  (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  Further, "[c]ross motions for summary judgment do not change the standard."  *Perez-Santiago v. Volusia Cnty.*, 2010 WL 917872 (M.D. Fla.) (internal citations and quotations omitted).

### III.  DISCUSSION

#### A.  Whether the MCS-90 Should be Incorporated into the Grange Policy as a Matter of Law

Pursuant to the Motor Carrier Act of 1980 and regulations promulgated thereunder, certain interstate motor carriers must obtain an insurance policy containing a MCS-90 endorsement "providing that the insurer will pay within policy limits any judgment recovered against the insured motor carrier for liability resulting from the

carrier's negligence." *Waters v. Miller*, 564 F.3d 1355, 1357 (11th Cir. 2009) (internal citation and quotations omitted). The primary purpose of the MCS-90 endorsement is "to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways." 49 C.F.R. § 387.1. "In order to accomplish this purpose, the endorsement makes the insurer liable to third parties for any liability resulting from the negligent use of any motor vehicles by the insured, even if the vehicle is not covered under the insurance policy." *Waters v. Miller*, 560 F. Supp. 2d 1318, 1321 (M.D. Ga. 2008) (internal quotations and citation omitted). The MCS-90 endorsement applies "regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." 49 C.F.R. § 387.15. It is, in effect, a suretyship by the insurance carrier to protect the public. *Waters*, 560 F. Supp. 2d at 1321.

Here, Grange and Pinson did not intend to insure Pinson's tractor. Pinson intended, and the lease agreement provided, that Lumber would provide the required insurance coverage for Pinson's tractor. Grange, perhaps naively given its stipulated knowledge that Pinson was a motor carrier, only intended to insure Pinson's pick-up truck and camper.

Nevertheless, the Defendants contend that "[s]ince Grange had actual knowledge Pinson was a for-hire interstate motor carrier, it was obligated to issue an insurance policy which complied with federal law. … [T]his Court should engraft a MCS-90 onto the policy as a matter of federal law." (Doc. 26-2 at 2). Further, the Defendants contend that once the Court writes the MCS-90 endorsement into the policy, it should

require that the MCS-90 endorsement be applied to Lake's and Williams' claims "irrespective of whether there may be other coverage or tortfeasors which contribute to satisfying the claims of an injured member of the motoring public." (Doc. 26-2 at 2). Grange contends that no authority supports incorporating a MCS-90 endorsement into a general commercial liability policy issued to a "business that happens to be a 'motor carrier.'" (Doc. 34 at 2).

The most comprehensive discussion of the issue in this circuit is found in Judge Clay D. Land's decision in *Waters v. Miller*, 560 F. Supp. 2d 1318 (M.D. Ga. 2008). In *Waters*, the insured owned a tractor-trailer that he used to haul automobiles. *Waters*, 560 F. Supp. 2d at 1319. The insured had a commercial vehicle insurance policy covering the tractor-trailer, but the insurer cancelled the policy for nonpayment of premiums just before the truck rear-ended the Plaintiff's car. *Id.* If the policy had had a MCS-90 endorsement, the cancellation would not have been effective and the policy would have covered the tractor-trailer at the time of the accident.[8] However, the policy did not contain a MCS-90 endorsement because, according to the insurer, the insured was not operating interstate when it issued the policy. In other words, the insurer intended to, and did, insure the tractor-trailer but it did not intend to issue a MCS-90 endorsement because the vehicle was not supposed to cross state lines. The Plaintiff argued that the MCS-90 endorsement should be incorporated into the insurance policy as a matter of law because the tractor-trailer was operating interstate. *Id.* at 1321.

Judge Land disagreed, primarily because there was no evidence the insurer knew or should have known that the insured was operating the truck across state lines.

---

[8] It seems possible the insurer would have denied coverage anyway because the tractor-trailer was outside the territorial limits of the policy.

*Id.* at 1324.  On the contrary, "the record is clear that at the time the policy was issued [the insured] was not engaged in interstate travel."  *Id.* at 1323 n.3.

The Eleventh Circuit, in affirming Judge Land, held that because the plaintiff did not present sufficient evidence that the insurer knew or should have known the motor vehicle would be traveling interstate, the MCS-90 endorsement should not be written into the policy.  *Waters*, 564 F.3d at 1357-58.   The Eleventh Circuit thus found it unnecessary "to reach the issue of whether the endorsement can be read into a policy that does not contain it."  *Id.* at 1358.

The Defendants argue that this Court should apply Judge Land's "analytical framework" and find that a MCS-90 endorsement should be written into Grange's policy.  They point, of course, to Grange's stipulated knowledge that Pinson was a for-hire motor carrier engaged in interstate and intrastate travel.

However, there is a subtle, but significant, difference between the facts in *Waters* and the facts here.  In *Waters*, the insurer undertook to insure the insured's motor carrier operations.  Grange did not.  It would be one thing to rewrite a policy issued to cover motor carrier operations to include a MCS-90 endorsement if that insurer knew the motor carrier whose operations it was insuring was hauling interstate.  However, it is quite another thing to require an insurer that was never asked to insure an insured's motor carrier operations generally or a particular tractor to cover that tractor with a MCS-90 endorsement.[9]  The Defendants cite no cases supporting such a proposition and the Court has found none.

---

[9] The Court acknowledges that one purpose of a MCS-90 endorsement is to provide coverage for a tractor even though that tractor is not scheduled in the policy.  The relevant point, however, is not just that the tractor was not scheduled, but rather that Grange never insured Pinson's motor carrier operations.

The Fifth Circuit addressed this issue in *Illinois Central Railroad Co. v. Dupont*, 326 F.3d 665 (5th Cir. 2003), the facts of which arguably present a compelling case for rewriting a motor carrier's insurance policy.  In *Dupont*, the insurer specifically insured one truck used by the insured in its logging operations.  *Id.* at 666-67.  When one of the insured's drivers was involved in an accident while hauling the insured's logs but with a non-scheduled truck not owned by the insured, the insurer denied coverage.  *Id.*  There being no other insurance available, the plaintiff contended that the MCS-90 endorsement should be deemed to be a part of the policy because the insured was a motor carrier subject to the Motor Carrier Act.  *Id.* at 667.

The Fifth Circuit disagreed.  First, even assuming that the logging company was a covered motor carrier, the court noted that it is the responsibility of the motor carrier, not the insurer, to obtain a MCS-90 endorsement.  *Id.* at 669; *see also Canal Insurance Co. v. Barker*, 2007 WL 3551508, *5 (E.D. Va.) ("When a motor carrier opts not to use an insurance policy to meet its financial responsibility requirements, then the regulations do not require the carrier to maintain a minimum of $750,000 in insurance. … In the present case, … the policy does not contain a MCS-90 endorsement.  Thus, it is evidence that this policy was not being used to satisfy the [motor carrier's] proof of financial responsibility requirement."). This makes sense, the Fifth Circuit reasoned, because the motor carrier is in the best position to determine whether the nature of its operations require a MCS-90 endorsement.

Moreover, the Fifth Circuit concluded, writing a MCS-90 endorsement into the policy, regardless of whether the motor carrier had requested or paid for the endorsement, would create a "perverse incentive."  *Id.*  "Motor carriers would then have

an incentive not to comply with the regulations and obtain the endorsement and pay the additional premiums associated with it, knowing that the courts would deem the endorsement part of the policy whether or not it was requested by the carrier." *Id.*; *see also Carolina Casualty Ins. Co. v. Zinsmaster*, 2007 WL 670937, *5 n.1 (N.D. Ind.) (reasoning, in the context of a policy lacking the MCS-90 endorsement, that the insurance company should not be obligated "to pay monies it did not contract to pay."). Thus, even though the insurer in *Dupont* insured the insured's trucking operations, the Fifth Circuit refused to rewrite the policy to include a MCS-90 endorsement.

The Defendants point to three circuit cases to support their position, but the cases are not at all applicable.  In each case, the insurers agreed, or conceded, that the MCS-90 endorsement should be incorporated in the policy, even though the endorsement was not physically attached to the policy. *See Prestige Casualty Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340 (6th Cir. 1996); *Travelers Ins. Co. v. Transp. Ins. Co.*, 787 F.2d 1133 (7th Cir. 1986); *Hagans v. Glens Falls Ins. Co.*, 465 F.2d 1249 (10th Cir. 1972).  For example, in *Hagans*, the Tenth Circuit assumed the endorsement was a part of the policy because the parties acted as though it was.  *Id.* at 1252.  Indeed, the insurer in *Hagans* had affirmatively represented to regulators that the policy complied with federal law by filing the appropriate certificate of insurance with the Interstate Commerce Commission.  *Id.* at 1252.  Unlike the cases cited by the Defendants, this is not a case of a mistakenly omitted MCS-90 endorsement that the parties agree should have been attached to the policy.

Lacking authority for the relief they seek, the Defendants essentially make a policy argument.  Given the deaths and injuries, the Defendants argue public policy

favors writing the endorsement into Grange's policy. "Assuming that public policy concerns should inform our analysis," as the Fifth Circuit put it in *Dupont*, that argument falls shorter here than it did in *Dupont*. Perhaps it would be "fair" to require an insurer to stand by a MCS-90 endorsement if it undertook to insure an insured's trucking operations and if, because of the absence of a MCS-90 endorsement, the public would not have the benefit of the minimum coverage required for an interstate motor carrier. Neither criterion is present here. Grange did not undertake to insure Pinson's trucking operations and, importantly from a "policy" standpoint, the victims had available to them the $3,000,000 coverage provided by Lumber's insurers. Tragically, that coverage is not adequate, but it nevertheless far exceeds the statutory minimum.[10]

In sum, the Court will not rewrite the Grange policy to incorporate a MCS-90 endorsement. Therefore, it is unnecessary to reach the issue of whether the MCS-90 endorsement would apply to this case if it were in the Grange policy.

## A.  Whether the Georgia Form F Should be Incorporated into the Grange Policy as a Matter of Law

Georgia's Motor Carrier Act requires a Form F endorsement, which operates roughly similar to the federal MCS-90 endorsement and requires the insurer to provide coverage in some situations even when the policy does not expressly provide coverage. The Defendants, citing *Sapp v. Canal Insurance Co.*, 288 Ga. 681, 706 S.E.2d 644 (2011), contend that if the Court does not incorporate the MCS-90 endorsement into the Grange policy, then the Court should require Grange to provide coverage "in an amount

---

[10] The Court is not suggesting that an insurer with an applicable MCS-90 endorsement could avoid payment because the vehicle is covered by a MCS-90 endorsement issued by another insurer. If two MCS-90 endorsements apply, both have to pay. *See Herrod v. Wilshire Insurance Co.*, 2012 WL 4820722 (10th Cir.); *Fairmont Specialty Ins. Co. v. 103012 Ontario, Inc.*, 2011 WL 3651333 (N.D. Ind.). The point here is that the presence of other insurance coverage undercuts policy arguments that the MCS-90 endorsement should be written into the Grange policy.

equal to its policy limits" pursuant to Georgia law.  (Doc. 26-2 at 2).  The Court rejects this argument for the same reasons it refuses to write a MCS-90 endorsement into the Grange policy.

However, discussion of *Sapp* is instructive.  In *Sapp*, the claimant was injured in an accident with a dump truck.  *Sapp*, 288 Ga. at 681, 706 S.E.2d at 645.  The insurance policy at issue was "a basic automobile liability policy rather than a motor carrier policy" that provided liability coverage for the dump truck.  *Id.*  Though the insurance policy covered the dump truck, the policy contained a "50-mile radius of use limitation" which, the insurance company argued, precluded coverage for the accident. Reversing the Georgia Court of Appeals, the Georgia Supreme Court held the motor vehicle insurance policy was subject to Georgia's Motor Carrier Act.[11]

The supreme court gave two reasons for its holding.  First, it was undisputed that the insured relied on his insurance agent to procure appropriate vehicle insurance for his trucking operations, and he was never informed that his policy lacked the endorsement necessary to provide motor carrier coverage.  *Id.* at 684, 706 S.E.2d at 648.  The insurer knew the insured was a motor carrier obtaining insurance for its motor carrier vehicles and "thus its need to obtain motor carrier insurance."  *Id.*  The insured had no reason to believe its policy fell short of the coverage required under Georgia law. *Id.*

Second, "the Court's rationale [] hinged on the policy purpose of the [ Georgia Motor Carrier] Act to protect the motoring public."  *Id.* at 685, 706 S.E.2d at 648.  "This being the case, any negative consequences arising from noncompliance with the Act should be suffered by the insured motor carrier or its insurer…."  *Id.*  Without subjecting

---

[11] O.C.G.A. § 46-7-1 *et seq.*

the policy to the Georgia Motor Carrier Act, the traveling public would be left without any liability insurance protection for injuries caused by the motor carrier.  *Id.*

The supreme court concluded that when an insurance company issues a motor vehicle policy to a motor carrier, with knowledge that the insured vehicles will be used in the insured's motor carrier operations, then the policy is subject to the requirements of Georgia's Motor Carrier Act.  *Id.* at 687, 706 S.E.2d at 650.  Thus, the Act operated to negate the insurance policy's fifty mile radius of use limitation because it "would serve to reduce or negate [the insurance company's] obligation to the motoring public."  *Id.* at 685, 706 S.E.2d at 649.

*Sapp* is easily distinguishable.  Indeed, the facts in *Sapp* make the public policy argument that the Defendants here cannot make.  Unlike the insurer in *Sapp*, Grange did not undertake to insure Pinson's tractor, and the traveling public has not been left without any liability insurance protection.

In sum, the Court does not find it appropriate to rewrite Grange's policy to include a Form F endorsement.

## IV. CONCLUSION

Grange's Motion for Summary Judgment is **GRANTED**.  The Grange policy does not provide coverage to Pinson and Boatwright for claims arising out of the August 8 accident.  The Defendants' Motion for Summary Judgment is **DENIED**.

**SO ORDERED**, this 5th day of February, 2013.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT